# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HAROLD H.W. GOUGH, *in personam*, TYEE, U.S. Documented Vessel, *in rem*, <br><br>Plaintiff, <br><br>v. <br><br>U.S. NAVY, et al., <br><br>Defendants. | CASE NO. 08CV1360 BTM(BLM) <br><br>**ORDER GRANTING MOTIONS TO DISMISS** |

Defendant Western Maritime, Inc. dba Vessel Assist San Diego ("Vessel Assist") and Defendants San Diego Unified Port District ("Port District") and San Diego Harbor Police ("Harbor Police") have filed motions to dismiss Plaintiff's Complaint. For the reasons discussed below, Defendants' motions to dismiss are **GRANTED**.

## I. FACTS

This case arises out of damage that was done to Plaintiff's sailing vessel, the "Tyee," when it was beached during inclement weather. Plaintiff claims that the beaching could have been prevented if Defendants rendered proper assistance.

According to Plaintiff's Verified Complaint, on May 23, 2008, Plaintiff and a passenger were on board the "Tyee," a 48' ketch-rigged double-ender, which was anchored off the beach or shoal located just south of the entrance to San Diego Bay (a U.S. Navy Security

Zone designated as "Western Beach"). (Compl. ¶ 20.) Plaintiff contends that the sole reason the "Tyee" was anchored there rather than in the San Diego Bay's designated free anchorages was the result of a last minute cancellation of his anchorage permit. (Compl. ¶ 21.) Plaintiff contends that any anchorage permit granted by the city of San Diego is conditioned on the understanding that such permit is not revocable. (Id.)

Later in the day, the local offshore marine area was in a small craft warning status due to adverse and inclement weather. (Compl. ¶ 26.) Due to the coming of nightfall, Plaintiff attempted to return to the safety of the "La Playa" anchorage. (Id.) Plaintiff is an experienced sailor. (Compl. ¶ 28.) However, Plaintiff encountered difficulty in raising the vessel's main sail because of a fouled halyard. (Compl. ¶ 30.) Because Plaintiff was unable to clear the halyard, Plaintiff utilized the mizzen and jib sails to commence sailing back into the bay. (Id.)

Due to the reduced sails, Plaintiff had great difficulty navigating the "Tyee" and spent approximately three hours attempting to sail around the tip of the jetty. (Compl. ¶ 27.) At this time, Plaintiff was approached by a U.S. Coast Guard vessel. (Id.) The Coast Guard crew asked Plaintiff if he was in trouble. (Id.) Plaintiff responded that he was experiencing great difficulty going upwind past the jetty due to his equipment failure and requested a short tow to clear the jetty tip and sail safely back into the San Diego Bay. (Id.) Plaintiff explained that he was in danger of going ashore if the vessel's anchor failed to hold. (Compl. ¶ 30.) On the orders of a superior officer, the Coast Guard crew refused to render any assistance to Plaintiff or the vessel. (Compl. ¶ 29.) The Coast Guard crew told Plaintiff that they would remain in the immediate area and that he could call them on VHF Channel 16 if the need arose. (Compl. ¶ 31.) Plaintiff anchored the Tyee.

At approximately 10:30 p.m. later that same night, Plaintiff awoke when he felt the bottom of his vessel grazing a hard surface, possibly the beach's bottom. (Compl. ¶ 32.) Plaintiff called the Coast Guard on Channel 16 and told them he had a developing emergency situation and that it was possible that the "Tyee" was dragging its anchor and was going up on the beach. (Id.) The Coast Guard responded that help was on the way. (Id.)

Approximately 20 minutes later, a San Diego Harbor Police vessel arrived. (Id.)

The San Diego Harbor Police ordered Plaintiff and his passenger to put on life vests and get into the vessel's dinghy. (Compl. ¶ 33.) According to Plaintiff, he was ordered to turn over command of the vessel to the San Diego Harbor Police. (Id.) Plaintiff complied with the Harbor Police officers' instructions, assuming that they would take a line off the vessel's bow and rotate the vessel off the soft grounding into deeper water where it could be reanchored safely. (Compl. ¶ 34.)

Plaintiff and his passenger were delivered safely to the docks at Shelter Island. (Compl. ¶ 36.) However, the Harbor Police did not make any efforts to move the vessel to safety. (Compl. ¶ 34.) The Harbor Police did contact civilian private towing services, defendants Sea Tow and Vessel Assist, to inquire whether they would provide private assistance. (Compl. ¶ 37.) These private businesses did not provide any assistance because Plaintiff was unable to verify the availability of a minimum of $5,000 in immediate cash funds to pay for their services. (Id.)

A U.S. Navy security boat was at the police dock and initially offered to render assistance by pulling the "Tyee" off the beach. (Compl. ¶ 38.) However, the crew's supervisor denied permission to render assistance. (Id.)

According to Plaintiff, there was a one-hour window of opportunity to safely pull the "Tyee" off the beach before the tide started to go out. (Compl. ¶ 39.) Because the vessel was not extracted during this window, unnecessary and costly damage was done to the vessel when it was ultimately extracted by Sea Tow under contract with the U.S. Coast Guard. (Compl. ¶ 40.)

Plaintiff asserts claims against the U.S. Navy, U.S. Coast Guard, the Harbor Police, Sea Tow Vessel Assistance ("Sea Tow"), and Vessel Assist based on their alleged failure to render maritime emergency distress assistance, resulting in the preventable beaching of the "Tyee."[1] Plaintiff also asserts a claim against the Port Authority based on its alleged failure

---

[1] Although Plaintiff asserts that this action is being brought *in rem* as well as *in personam*, the *in rem* procedure is inapplicable here. An *in rem* action may be brought against a vessel as a defendant only if the plaintiff possesses a maritime lien against it. See Madruga v. Superior Court, 346 U.S. 556, 560 (1954).

1  to properly train the Harbor Police to render maritime emergency distress assistance.

## II. STANDARD

Under Fed. R. Civ. P. 8(a)(2), the plaintiff is required only to set forth a "short and plain statement" of the claim showing that plaintiff is entitled to relief and giving the defendant fair notice of what the claim is and the grounds upon which it rests. Conley v. Gibson, 355 U.S. 41, 47 (1957). A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) should be granted only where a plaintiff's complaint lacks a "cognizable legal theory" or sufficient facts to support a cognizable legal theory. Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1988). When reviewing a motion to dismiss, the allegations of material fact in plaintiff's complaint are taken as true and construed in the light most favorable to the plaintiff. See Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995). Although detailed factual allegations are not required, factual allegations "must be enough to raise a right to relief above the speculative level." Bell Atlantic v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007). "A plaintiff's obligation to prove the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id.

## III. DISCUSSION

Vessel Assist moves to dismiss Plaintiff's Complaint on the ground that it had no duty to render assistance to Plaintiff. The Port Authority and Harbor Police similarly contend that they did not owe Plaintiff any duty to tow his vessel into deeper waters. As discussed below, the Court agrees that none of the defendants had a duty to assist Plaintiff either by towing the "Tyee" into the San Diego Bay or, once the "Tyee" had come up on the beach, by towing it into deeper water.

A. Admiralty Jurisdiction

It appears that Plaintiff has invoked the admiralty jurisdiction of this Court. The case

1  is not a diversity action, and Plaintiff makes reference to violations of admiralty and maritime
2  law.
3        A party seeking to invoke federal maritime jurisdiction over a tort claim must satisfy
4  both a location test and a connection test. <u>Jerome B. Grubart, Inc. v. Great Lakes Dredge
5  & Dock Co.</u>, 513 U.S. 527, 534 (1995).   Under the location test, the court must determine
6  whether the tort occurred on navigable water. <u>Id.</u>  The connection test has two prongs, each
7  of which must be satisfied: (1) "A court, first, must assess the general features of the type
8  of incident involved to determine whether the incident has a potentially disruptive impact on
9  maritime commerce[.]" <u>Id.</u> (internal citation and quotation marks omitted); (2) "Second, a
10 court must determine whether the general character of the activity giving rise to the incident
11 shows a substantial relationship to traditional maritime activity." <u>Id.</u> (internal quotation marks
12 omitted).
13       Here, the alleged tort occurred on navigable water.  Contrary to Vessel Assist's
14 contention, the fact that the vessel was in shallow water when it struck the beach does not
15 mean that the incident did not occur in "navigable water." <u>See</u> <u>Turner v. Bentley Indus., LLC</u>,
16 2007 WL 707396 (N.D. Fla. March 5, 2007) (explaining that incident occurred in navigable
17 waters even though the pleasure craft was anchored in shallow water some distance from
18 the navigation channel of the sound).
19       The activity giving rise to the incident in this case was the grounding of a vessel on
20 navigable waters.  This activity is substantially related to traditional maritime activity. <u>See
21 Sisson v. Ruby</u>, 497 U.S. 358, 364-65 (1990) (holding that storage and maintenance of a
22 vessel at a marina on navigable waters fell within the substantial relationship requirement).
23 In addition, considering the general features of the incident (i.e., a 48 foot vessel in navigable
24 waters that has been grounded on the beach at night), the incident had a potentially
25 disruptive impact on maritime commerce.  The grounded "Tyee" could have posed a danger
26 to other vessels and could have obstructed navigation of the waters nearby.
27       Therefore, the Court finds that it has admiralty jurisdiction over this action.
28

B. Negligence

Plaintiff's claims against Defendants are negligence claims. Plaintiff claims that defendant U.S. Coast Guard had a statutory and/or moral duty to tow his vessel to the safety of the La Playa anchorage and that the other defendants had a statutory and/or moral duty to tow his vessel into deeper water once his vessel ran aground. The Court finds that Defendants did not owe Plaintiff a duty to render the aforementioned assistance.

When jurisdiction is maritime, the general principles of maritime negligence rather than common law negligence apply. Pope and Talbot v. Hawn, 346 U.S. 406 (1953). However, like common law negligence, the elements of a maritime negligence cause of action include: (1) the existence of a duty; (2) breach of said duty; (3) proximate cause; and (4) actual loss or injury to the plaintiff due to the improper conduct. Prince v. Thomas, 25 F. Supp. 2d 1045, 1047 (N.D. Cal. 1997).

Plaintiff points to 46 U.S.C. § 2304 as a statutory source of Defendants' duty to provide him assistance. This statute provides:

> A master or individual in charge of a vessel shall render assistance to any individual found at sea *in danger of being lost*, so far as the master or individual in charge can do so without serious danger to the master's or individual's vessel or individuals on board.

(Emphasis added.) However, according to the facts pled in the Complaint, Plaintiff was not in any danger of being lost at sea. Moreover, to the extent Plaintiff and his passenger were in any bodily danger, the Harbor Police made sure that they got to land safely.

With respect to the Harbor Police, Plaintiff cites to San Diego Unified Port District Code § 8.25, which states that "the Executive Director or any harbor police officer is hereby authorized to remove and impound any vessel, watercraft or object found in violation of any Federal or State law or provision of this Code in accordance with the procedures set forth in this Section . . . ." Plaintiff misconstrues this regulation, which does not require the harbor police to provide general protection to vessels, but, rather, permits the harbor police to remove or impound vessels found in violation of the law.

Plaintiff also generally cites to the "Mariner's Code of Conduct" (it is unclear whether

this is an unwritten moral code or some sort of publication) and a maritime law treatise, "The Law of the Seaman," authored by Robert Force and Martin J. Norris.  These sources do not establish the existence of a duty on the part of Defendants to render assistance to Plaintiff under the circumstances of this case.

Under the principles of general maritime law, a private party has no affirmative duty to rescue a vessel or person in distress.  Wright v. United States, 700 F. Supp. 490, 494 (N.D. Cal. 1988).  This same principle applies to the U.S. Coast Guard.  Id.  See also Frank v. United States, 250 F.2d 178, 180 (1957) (explaining that although the Coast Guard may render aid to persons and protect property, federal legislation falls short of creating a governmental duty of affirmative action).  Similarly, absent statutes or regulations providing otherwise, the Harbor Police and San Diego Port Authority do not owe a duty of affirmative action to a person or vessel in distress.

Once a private salvor renders voluntary assistance, however, the salvor may be held liable if an attempted rescue affirmatively injures the person in distress or worsens his position.  Frank, 250 F.2d at 180.  Where the salvor takes affirmative actions that cause some physical change to the environment or some other material alteration of circumstances, the relevant test is "not whether the risk was increased over what it would have been if the defendant had not been negligent, but rather whether the risk was increased over what it would have been had the defendant not engaged in the undertaking at all."  Thames Shipyard and Repair Co. v. United States, 350 F.3d 247, 261 (1st Cir. 2004) (internal quotation marks omitted).  Liability may also be established on a theory of induced justifiable detrimental reliance, such as when the Coast Guard's actions cause potential rescuers to rest on their oars in reliance on the Coast Guard's undertaking.  Id.

In this case, the Coast Guard crew did not render any assistance upon instructions of a superior officer.[2]  They did not take any affirmative actions that injured Plaintiff or his

---

[2] The U.S. Navy and U.S. Coast Guard have not filed a response to the Complaint. Upon review of the proofs of service filed by Plaintiff, it appears that these defendants were not served in compliance with Fed.R.Civ.P. 4(i), which governs service on the United States and its agencies.  Nevertheless, the Court will address Plaintiff's claims against these

vessel, nor did they induce detrimental reliance on the part of Plaintiff or other potential rescuers. Therefore, the U.S. Coast Guard cannot be held liable for negligence. See, e.g., Oxman v. United States, 1993 WL 651904 (D. Or. June 21, 1993) (holding that the Coast Guard was not liable for negligence because the ship would have sunk regardless of the Coast Guard's rescue efforts, and Plaintiff did not forgo other possible sources of assistance); Albinder v. United States, 703 F. Supp. 246 (S.D.N.Y. 1987) (holding that the Coast Guard was not liable because the defective pumps did not increase the risk of harm, and Plaintiff did not allege that the vessel's crew decided to forgo other avenues of rescue in reliance on the Coast Guard's efforts).

After Plaintiff's vessel went aground, Plaintiff claims that the Harbor Police ordered him and his passenger off the vessel and took command of the vessel. Even if this is true, Plaintiff does not allege that the Harbor Police took any affirmative action that harmed him. Rather, Plaintiff complains that the Harbor Police did not tow his vessel into deeper water before the tide went out. Plaintiff does not allege, however, that the Harbor Police *prevented* him from getting someone else to tow his vessel, nor does Plaintiff allege that he chose to forgo other means of getting his vessel towed due to reliance on the Harbor Police's rescue efforts. Nor does Plaintiff allege that had he stayed on the vessel he could have prevented the damage. Indeed, Plaintiff alleges that the Harbor Police contacted private contractors Vessel Assist and Sea Tow to determine whether they could provide assistance. These companies did not provide assistance because Plaintiff could not verify that he had $5,000 to pay for the services. It appears that Plaintiff would have been faced with the obstacle of verifying cash availability whether or not the Harbor Police got involved in the situation. Because the Harbor Police did not put Plaintiff in a worse position than he would have been in had the Harbor Police not engaged in rescue efforts, the Harbor Police are not liable for

---

defendants because the same law governs all of Plaintiffs' claims and the simultaneous consideration of all of Plaintiff's claims will promote judicial economy. The Court notes that although Plaintiff cites to the Federal Tort Claims Act as the statutory basis for his claims against the United States, the Suits in Admiralty Act, 46 U.S.C. § 741, et seq., is the exclusive remedy against the United States for maritime torts. Williams v. United States, 711 F.2d 893 (9th Cir. 1983).

any damage to Plaintiff's vessel. Plaintiff's negligent training claim against the Port Authority is also dismissed because it is predicated on Plaintiff's negligence claim against the Harbor Police.[3]

Finally, based on the allegations of the Complaint, Vessel Assist, Sea Tow,[4] and the U.S. Navy did not render any assistance to Plaintiff and did not induce any justifiable reliance. Therefore, Plaintiff's claims against these defendants fail as well.

### IV. CONCLUSION

For the reasons discussed above, Defendants' motions to dismiss are **GRANTED**. Plaintiff's Complaint is dismissed in its entirety for failure to state a claim. However, the Court grants Plaintiff leave to file a First Amended Complaint within 20 days of the filing of this order. If Plaintiff fails to file an amended complaint within the prescribed time, the Court shall order the Clerk to close this case.

**IT IS SO ORDERED.**

DATED: August 25, 2009

_____
Honorable Barry Ted Moskowitz
United States District Judge

---

[3] It is unclear whether Plaintiff seeks to hold the Port Authority responsible for the damage to his vessel based on the cancellation of his anchorage permit. To the extent that he does, Plaintiff's claim fails because, among other things, the beaching of his vessel was not a reasonably probable consequence of the cancellation of his permit.

[4] Sea Tow has not responded to the Complaint.